UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

EDGAR TEJEDA, ET AL.                                    CIVIL ACTION

VERSUS                                                  NO. 22-2758

JONATHAN DIXON, ET AL.                                  SECTION "A" (5)

<u>**ORDER AND REASONS**</u>

The following motion is before the Court: **Motion for Summary Judgment (Rec. Doc. 52)** filed by defendant, CorePointe Insurance Co. Oppositions to the motion have been filed by the plaintiffs, Edgardo Tejeda, in his capacity as the court-appointed curator of his son, Edgar Tejeda, and Sierra Lherisse, on behalf of her minor son, Edgar Tejeda, Jr., and defendant, Sentry Select Insurance Co. The motion, submitted for consideration on August 21, 2024, is before the Court on the briefs without oral argument. For the reasons that follow, the motion is denied.

**I.**

The tragic events giving rise to this litigation occurred on the evening of July 4, 2021, at about midnight. Edgar Tejeda was a pedestrian near the 6000 block of Almonaster in New Orleans, Louisiana, when he was struck by a 2012 Peterbilt truck that was owned and operated by the defendant, Jonathan Dixon.[1] Dixon and Tejeda knew each other from around the neighborhood. As a result of the accident, Tejeda suffered life-threatening and permanently disabling personal injuries. It is Dixon's contention that Tejeda stepped out in front of the truck and that there was nothing that

---

[1] The specific Peterbilt truck that Dixon was driving that evening was actually owned by his father. (Rec. Doc. 64-4, Statement at 13); (Rec. Doc. 64-2, Dixon deposition at 206).

1

Dixon could have done to avoid the accident.

On August 24, 2020, which was several months prior to the accident, Dixon and Fifth Wheel Transportation, LLC became parties to a contractual agreement whereby Dixon had agreed to contract to Fifth Wheel the truck (and qualified drivers, presumably himself) that was involved in the accident. (Rec. Doc. 52-4 at 23, Independent Contractor Agreement). Fifth Wheel was therefore a "trucking company lessee," a term used frequently in the jurisprudence. A policy issued by Sentry Select Insurance Co. provided coverage when the truck was being used in Fifth Wheel's business.

Separately, CorePointe Insurance Co. issued two non-trucking insurance policies, one primary and one excess, covering the owner/operator of trucks leased to Fifth Wheel but expressly excluding coverage "while [the truck is being] used *in the business* of anyone to whom the [truck] is rented."[2] (Rec. Doc. 52-5, Policy at CIC 0040) (emphasis added).

CorePointe's motion for summary judgment is grounded on the contention that the evidence of record demonstrates that when Dixon hit Tejeda on the evening of July 4, 2021, he was operating the truck "in the business" of Fifth Wheel thereby triggering the foregoing non-trucking use exclusion, which applies to both its primary and excess policies. CorePointe contends that the Fifth Circuit's decision in *Mahaffey v. General Security Insurance Co.*, 543 F.3d 738 (5th Cir. 2008), and 49 C.F.R. § 395.2, provide

---

[2] The contract with Fifth Wheel did not involve relinquishing physical possession of the privately-owned truck, which remained with Dixon. Because there would be occasions when Dixon operated the truck while not working for Fifth Wheel, the trucking company lessee, a separate non-trucking insurance policy was required. Apparently, this arrangement is typical in the trucking industry.

binding law for its position, and that *Williams v. Great American Insurance Co.*, 240 F. Supp. 3d 523 (E.D. La. 2017), decided by the late Judge Marty Feldman, demonstrates how *Mahaffey* should apply to the instant case.

The plaintiffs oppose CorePointe's motion for summary judgment, as does Sentry Select, which naturally takes issue with the suggestion that its policy alone should cover the accident.[3]

A jury trial had been scheduled for November 4, 2024, but the trial was continued without opposition so that necessary discovery could continue. (Rec. Doc. 56, Order). A follow-up status conference with the Court is currently scheduled for September 26, 2024. (Rec. Doc. 69, Minute Entry).

## II.

The question before the Court is whether CorePointe has demonstrated via undisputed facts that Dixon was operating his truck "in the business" of Fifth Wheel on the evening of July 4, 2021, when he hit and injured Tejeda. If CorePointe meets this burden then the non-trucking use exclusion in its policy will be triggered. Before delving into the facts of this case, an understanding of the Fifth Circuit's holding in *Mahaffey v. General Security Insurance Co.*, which involved a non-trucking use exclusion nearly identical to the one found in CorePointe's policy, is helpful.[4]

---

[3] It is not clear to the Court at this time whether coverage under the CorePointe and Sentry Select policies is mutually exclusive or whether there may be factual scenarios where coverage under both policies could be triggered.

[4] Under Louisiana law, the insurer has the burden of proving that an otherwise covered loss falls within an exclusion to the policy. *Choice Found. v. Law Indus., LLC*, 336 So. 3d 501, 505 (La. App. 4th Cir. 2022) (citing *Perniciaro v.McInnis*, 255 So. 3d 1223, 1231 (La. App. 4th Cir. 2018)). Therefore, CorePointe is seeking summary judgment on an issue for which it will bear

In *Mahaffey*, a truck driver had been dispatched to haul a load of goods from Kentucky to New Orleans. Upon completing that assignment, the driver did not simply call it a day and head for home. Instead, he contacted the trucking company's dispatcher, who told him to "take the rest of the night off and call [the dispatcher back] in the morning to see if they had a load." *Mahaffey,* 543 F. 3d at 739. The driver then drove the truck "bobtailed," *i.e.*, without its trailer attached, to a truck stop where he ate dinner, watched television, took a shower, and played slot machines. The driver stayed at the truck stop between six and seven hours. *Id.* Instead of sleeping in his truck that night, which was his wont, the driver decided to drive to a motel for the night. On his way to the motel the truck driver was involved in an automobile accident with Mahaffey, who was injured, and later sued the driver and the insurer. *Id.*

The issue on summary judgment in *Mahaffey* was whether or not the truck driver was "in the business of" the trucking company at the time of the accident so as to trigger the non-trucking use exclusion in a policy issued by Redland Insurance Co. Based on the facts recited above, the district court had concluded that the non-trucking use

---

the burden of proof at trial.

In a typical motion for summary judgment, it's the non-movant who bears the burden of proof at trial on the issue presented. In that typical situation the movant can obtain summary judgment by simply pointing to the absence of evidence supporting the non-movant's claim, at which point the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial. *See, e.g., Citgo Petroleum Corp. v. Lake Charles Metal Trades Council*, 175 F. Supp. 3d 662, 667 (W.D. La. 2016) (citing *Vera v. Tue*, 73 F.3d 604, 607 (5th Cir. 1996); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). But given that CorePointe is moving for summary judgment on an issue for which it will bear the burden of proof at trial, it must show *affirmatively* via credible evidence the absence of a genuine issue of material fact, such that it would be entitled to a directed verdict at trial because no reasonable jury could find for the non-moving party. *Preis v. Lexington Ins. Co.*, 508 F. Supp. 2d 1061, 1067–68 (S.D. Ala. 2007), *aff'd,* 279 F. App'x 940 (11th Cir. 2008) (citing *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1438 (11th Cir.1991)).

exclusion in Redland's policy had not been triggered (in other words, Redland owed primary coverage), because the driver had no "pending, definite assignment" and no requirement from the dispatcher that he remain in New Orleans, and therefore was not "in the business of" the trucking company lessee at the time of the accident. *Mahaffey,* 543 F. 3d at 740.

On appeal, the Fifth Circuit first clarified that the phrase "in the business of" in a non-trucking use endorsement is unambiguous as a matter of law, and the mere difficulty in applying the endorsement to certain factual scenarios does not render it otherwise. *Id.* at 741. Since Louisiana law applied, the Fifth Circuit sought guidance in the only Louisiana court of appeal case (as of that time) to have considered whether a driver was "in the business of" a trucking company lessee, *LeBlanc v. Bailey*, 700 So. 2d 1311 (La. App. 4th Cir. 1997).

In *LeBlanc*, the panel judges had noted that there was no bright-line rule to determine whether an independent trucker is acting in the business of the trucking company lessee. 700 So. 2d at 1314. But given that the truck driver in *LeBlanc* was involved in the accident at issue while en route to his home after finishing his deliveries for the day—and therefore, not under dispatch or on standby for further deliveries, free to go where he pleased, not subject to the lessee's control or being paid for his time or mileage—the *LeBlanc* panel was concerned that construing the bobtail policy to exclude coverage when the driver was driving home would "render the non-trucking use endorsement meaningless and would defeat [the insured's] very purpose in securing" that type of coverage. *LeBlanc*, 700 So. 2d at 1314-15.

5

And even though *LeBlanc* did not specifically enumerate factors to be considered in determining whether a driver is "in the business of" another for the purpose of Louisiana insurance law, the Fifth Circuit in *Mahaffey* did glean from the *LeBlanc* opinion several non-exclusive factors: whether the driver was free to go where he pleased; whether the driver was paid for time or mileage; whether the driver was under dispatch or standby for further deliveries; and whether the activity was more of a personal or work-related function. *Mahaffey*, 543 F.3d at 742 (citing *Leblanc*, 700 So. 2d at 1314). According to the Fifth Circuit, *LeBlanc* exemplifies circumstances under which the non-trucking use endorsement does not preclude coverage, *i.e.*, when a driver is driving home after dropping a load off without further instructions. *Mahaffey*, 543 F.3d at 744. Essentially, the *LeBlanc* trucker's drive home was more of a personal task rather than a work-related function. *Mahaffey*, 543 F.3d at 742 (quoting *Leblanc*, 700 So. 2d at 1314). The Fifth Circuit observed that there were "other [factual] circumstances" where a vehicle is *not* being "used in the business" of the party to whom the auto is leased but declined to elaborate on what those might be. *Id.*

Applying *LeBlanc*'s reasoning to the facts presented in *Mahaffey*, the Fifth Circuit concluded that the truck driver in *Mahaffey* was acting "in the business of" the trucking company lessee when he was involved in the auto accident after leaving the truck stop and while driving to the motel for the night. *Mahaffey*, 543 F.3d at 742. Unlike the driver in *LeBlanc*, the driver in *Mahaffey* was not heading home after completing his deliveries, and he was on standby for further deliveries. The dispatcher told the driver to take the night off but had not released the driver to return to his home in Missouri. While it was

6

true that the driver was not obligated to accept another load, he had affirmatively sought another load from the dispatcher and had complied with the request that he take the night off and call the next day about a possible load. *Id.*

Although the driver was "free to go where he pleased" while awaiting a possible load the next morning, and therefore the lessee was not directing his activities that evening when he was involved in the accident, the driver would have had to stay close to New Orleans to be available to pick up a load. *Mahaffey*, 543 F.3d at 742. The driver was not paid for his time or mileage while waiting for the next load, but he would have lost the opportunity to earn return-trip income if he had left before ascertaining whether a load would be available the next morning, and the lessee would have lost an available driver. *Id.* at 742-43. Therefore, the driver was furthering the lessee's commercial interests to have a driver on standby and available to take a load the next day, regardless of whether one actually became available. *Id.* at 743. Finally, unlike driving home after completing deliveries, driving to a motel far from home in order to sleep to be adequately rested, when asked to remain in the area to see if a load becomes available, is a work-related function for a commercial driver because commercial drivers are required to have a certain number of rest hours between hauls. *Id.* Accordingly, as a matter of law the driver in *Mahaffey* was acting in the business of the trucking company/lessee. *Id.*

Judge Feldman's ruling in *Williams v. Great American Insurance Co.*, while not controlling, provides a rather straightforward application of the *Mahaffey* principles. In *Williams*, the Missouri-based truck driver had delivered a loaded trailer to Pearl River,

Louisiana. Due to the late hour he left the loaded trailer at the facility for unloading and drove to a spot nearby to sleep in his tractor. *Williams*, 240 F. Supp. 3d at 524-25. In the early morning hours, while the driver was asleep in the tractor, Williams collided his vehicle with the tractor, which he claimed was illegally parked. *Id.* at 525. The issue was whether the truck was being used in the business of the trucking company lessee when Williams hit it with the sleeping driver inside.

The evidence produced in support of summary judgment revealed that although the driver considered the goods delivered when he left the loaded trailer at the Pearl River facility, the load had been accepted at the delivery point with the understanding that the cargo would be counted the next morning when the trailer was unloaded. *Id.* at 525. Further, the driver planned to return to the Pearl River facility in the morning to retrieve the unloaded trailer and transport it to the lessee's facility in Gulfport, Mississippi. The driver had planned to do this so that he could pick up another load for the lessee and deliver it to a receiver on his return trip up north. *Id.* Importantly, it was the lessee's policy that when a driver delivered a load to the Pearl River facility, he must wait for an empty trailer to bring to the Gulfport facility to pick up a load for the return trip north. *Williams*, 240 F. Supp. 3d at 526. This policy ensured that each driver was carrying a revenue-producing load on the trip to and from Peal River and Gulfport. *Id.* Based on these facts, Judge Feldman concluded that the truck had been being used in the business of the lessee when the accident occurred, and therefore that the non-trucking exclusion applied. *Id.* at 530.

In so ruling Judge Feldman observed that the driver was not heading home or

otherwise off the clock at the time of the accident but rather was waiting in Pearl River to retrieve the trailer he had delivered there, after which and *pursuant to the lessee's policy*, he was to head to Gulfport to pick up another load for the lessee. *Id.* at 530. When the accident occurred the driver had been staying the night in Pearl River in accordance with the lessee's policy and taking his federally-mandated break while waiting for the empty available trailer to haul a load the next day. *Id.*

One obvious shared aspect of *Mahaffey* and *Williams* is that in both cases the truck driver had just completed a dispatched job by delivering a loaded trailer to its contractual destination—this was clearly activity "in the business of" the lessee. Presumably, had the drivers in *Mahaffey* and *Williams* not opted to remain in the distant delivery location (which they did pursuant to a dispatcher's instructions and a company policy) in order to obtain another dispatch assignment, which meant ongoing work in business of the lessee, but rather had called it quits and headed for home like the driver in *LeBlanc*, the outcome in both *Mahaffey* and *Williams* would have been different. What *Mahaffey* and *Williams* demonstrate is that once the truck driver commences acting "in the business" of the lessee by hauling and delivering a load, so long as he continues to act in the business of the lessee once he reaches his destination, even periods of engaging in off-duty activities such as driving to a motel for the night or sleeping do not necessarily disrupt the ongoing nature of being in the business of the lessee.

Turning now to the facts of this case, Dixon struck Tejeda with his Peterbilt truck late on the evening on July 4, 2021. It is undisputed that Dixon was not working for Fifth Wheel or for anyone else at the time of the accident.

But the day before the accident, on July 3, 2021, Dixon had used a broker website to line up a job for himself that entailed picking up a load of cargo in Tickfaw, Louisiana for delivery to Croswell, Michigan. By obtaining the job directly through the broker and not through Fifth Wheel, Dixon got to make more money on the assignment. (Rec. Doc. 64-2, Dixon deposition at 215). Dixon forwarded the job information to the dispatcher at Fifth Wheel.[5] (*Id.* at 24-26). Dixon took no other action on July 3, 2021, regarding the Tickfaw job. Dixon received no instructions to execute in preparation for the job or communications of any kind from anyone at Fifth Wheel with respect to the Tickfaw job, which was scheduled for pickup on July 5, 2021, at 8:00 a.m. in Tickfaw. (Dixon deposition at 26-27).

On July 4, 2021, the day of the accident, Dixon spent the day relaxing and hanging out with friends at a neighborhood tint shop and adjoining daquiri store parking lot. Dixon had visited that location where his friends where hanging out at least twice earlier that day, using his personal vehicle. (*Id.* at 33). The Peterbilt truck was located at Dixon's father's house, which is where the truck was parked when not being used. When Dixon left the tint shop for the second time that day, his plan was to go to his father's house to get the Peterbilt truck and go to the gas station to get it fueled in anticipation of the Tickfaw trip the next morning. (*Id.* at 34-35).

Dixon could have simply retrieved the Peterbilt truck from his father's house on the morning of July 5, 2021, and fueled it up after he had left his father's house for the Tickfaw pickup point. But Dixon wanted to buy fuel from a specific Discount Zone station

---

[5] Because of the contractual agreement with Fifth Wheel, Dixon had to go through the Fifth Wheel dispatcher even though he had located the job assignment himself.

*located in the opposite direction of Tickfaw* because it had the lowest priced fuel, which was an important consideration to Dixon because fuel costs are deducted from the fee that Dixon earns from Fifth Wheel.[6] (Dixon deposition at 37, 44). The reason that Dixon chose to fuel up the evening of July 4, 2021 instead of on the morning of July 5, 2021, was because he knew that once he started driving while under dispatch for Fifth Wheel the time used to fuel up, which would have taken him about 30 minutes round trip, would have counted against his federally-mandated daily driving allowance of 14 hours. (*Id.* at 216). Thus, Dixon's plan was to fuel up at the Discount Zone while on his own time and then return the truck to his father's house where it would remain parked until the next morning when Dixon left for the Tickfaw assignment. (*Id.* at 77, 113).

But after retrieving the Peterbilt truck, Dixon drove back to the tint shop where he had been socializing off and on that day because a couple of his friends were still there visiting in the parking lot. (*Id.* at 35-36). Tejeda was there too. (*Id.* at 39). Dixon stayed about an hour or so. (*Id.* at 36). Dixon considered himself not to be on duty for Fifth Wheel but rather on his personal convenience, which is why he set the Peterbilt's electronic log to "personal conveyance" mode because he was not under dispatch on the evening of July 4, 2021. (*Id.* at 118).

Dixon hit Tejeda on Almonaster Blvd. when he had finally left the tint shop for the evening and was heading in the direction of the Discount Zone to fuel up the Peterbilt

---

[6] Fifth Wheel does provide a fuel card for the driver's use and convenience but the fuel costs are deducted from the driver's settlement with Fifth Wheel. Dixon did not use the Fifth Wheel gas card on the evening of July 4, 2021, because it was not yet activated. (Dixon deposition at 211). The Fifth Wheel gas card is only active when the driver is under dispatch. (*Id.* at 208). It is the Court's understanding that the card was activated at some point on July 5, 2021.

truck. After the accident, Dixon left the truck parked on the side of the street on Almonaster and went to the hospital in a friend's car to check on Tejeda. (Dixon deposition at 41). When Dixon returned to the Peterbilt after leaving the hospital he drove it back to his father's house still unfueled and decided to just sleep in the truck on his father's street where the truck was normally parked when not being used. (*Id.* at 43). Dixon got up the next morning and finally proceeded to the Discount Zone to get fueled up before heading to Tickfaw. (*Id.*).

CorePointe's position is that when Dixon left the tint shop for the final time on the evening of July 4, 2021 in the Peterbilt truck, he was acting "in the business of" Fifth Wheel because trucks require fuel, and Dixon was headed to the Discount Zone to fuel up in anticipation of the Tickfaw job the next day.

The Court agrees with CorePointe insofar as it contends that the applicability of its non-trucking use exclusion should be determined by the Court as a matter of law given that no facts material to that determination are in dispute. But the Court's agreement with CorePointe's position ends there.

Neither *Mahaffey* nor *Williams* support CorePointe's position in this case. Both of those cases involved accidents that occurred after the truck driver had travelled to a delivery destination under dispatch for the lessee, which is clearly activity "in the business of" the lessee, and remained in the delivery area either pursuant to instructions from the dispatcher or a specific company policy, *i.e.*, continuing to act "in the business" of the lessee. Dixon might have been heading to the gas station in anticipation of the job the next morning, but he was not acting pursuant to any

12

instructions or directives whatsoever from Fifth Wheel or any policy of Fifth Wheel, who had not as yet activated Dixon's fuel card for the Tickfaw trip. Dixon had not departed for the Tickfaw trip when he retrieved the Peterbilt from his father's house and drove it to the tint shop to visit with his friends. And Dixon had not departed for Tickfaw when he finally left the tint shop to head to the Discount Zone.

Further, 49 C.F.R. § 395.2 does not declare that anytime a driver proceeds to fuel up his truck that time is "in the business" of the trucking company lessee. Section 395.2 clarifies that "on-duty time" includes time "inspecting, servicing, or conditioning" a commercial motor vehicle. But "on-duty time" runs from "the time a driver begins to work or is required to be in readiness to work until the time the driver is relieved from work and all responsibility for performing work."

Dixon clearly had not begun to work for Fifth Wheel on the evening of July 4, 2021, when he left his father's house in the Peterbilt and drove to the tint shop, and he had not begun to work for Fifth Wheel when he left the tint shop that evening. Nor did his work for Fifth Wheel require him to be in readiness to work on the evening of July 4, 2021. Dixon's decision to get "ready" by driving to the Discount Zone on the evening of July 4, 2021 was motivated solely by personal benefits to himself. Dixon decided to drive the truck in the opposite direction of Tickfaw to fuel up on the evening of July 4, 2021, because by doing so he would make more money on the job (by paying less for fuel) and avoid losing 30 minutes of driving time on the morning of July 5, 2021. While it is true that trucks do require fuel to run, CorePointe has identified no benefits whatsoever that Fifth Wheel would have obtained by Dixon's decision to fuel up on the

evening before the Tickfaw job, which is another glaring difference between this case and *Mahaffey* and *Williams*. Unlike the drivers in *Mahaffey* and *Williams*, Dixon was not furthering the commercial interests of Fifth Wheel on the evening of July 4, 2021.[7]

The Court is persuaded that under the facts of this case Dixon was not acting "in the business of" Fifth Wheel on the evening of July 4, 2021, when he struck Tejeda. CorePointe has not established that the non-trucking use exclusion of its policy was triggered so as to preclude coverage.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 52)** filed by the defendant, CorePointe Insurance Co., is **DENIED**.

September 3, 2024

JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE

---

[7] To be clear, while the applicability of the trucking use exclusion is determined as a matter of law when the material facts are not in dispute, the determination of whether the trucking use exclusion applies is extremely fact intensive. Even a slight alteration in the facts can dictate a different outcome. *See, e.g., Jurey v. Kemp*, 77 So. 3d 83 (La. App. 1st Cir. 2011); *George v. Suarez*, No. 2018-CA-0484, 2019 WL 168526 (La. App. 1st Cir. Jan. 10, 2019) (not published). For this reason, *Mahaffey* and *Williams* do not help CorePointe.